ALBERT KORTUM, Appellant, v. WILLIAM KORTUM, Appellee.

No. 40348.

JANUARY 13, 1931.

*Otto L. Schluter,* for appellants.

*J. C. France* and *Chamberlain & Chamberlain,* for appellee.

EVANS, J.—The petition is in several counts, which indicate different lines of approach to the relief prayed therein. The evidence in the case presents no serious controversy. The principal  controversy arises over the construction to be put upon some writings, and upon the inferences to be drawn from some circumstances, and upon the legal deductions to be applied thereto. The principals in the controversy are not parties to the case. These are Adolph and Josephine Kortum, both of whom were deceased prior to the beginning of this action. They were married in the year 1888. Each of them had been previously married, and each of them had two children as the fruit of such prior marriage. The children of Josephine were Robert and Frank Brinkman. The children of Adolph were William Kortum and Meta Kortum (now Kroeger). Robert Brinkman and the surviving widow and children of Frank Brinkman, deceased, are interveners in the case. William Kortum is the defendant. The plaintiff, Albert Kortum, is the fruit of the marriage of Adolph and Josephine, and was born subsequent to February, 1891.

At the time of the marriage, and for many years prior thereto, Adolph Kortum was, and had been, the owner of a farm of 60 acres, then occupied by him, and afterward occupied by the married pair. Josephine died in February, 1924, and her estate was fully administered by her administrator, her son Albert, plaintiff herein, and the same has been closed. Adolph Kortum died in December, 1928, and administration of his estate is still pending in Cedar County.

The claims of the plaintiff and his joining interveners are predicated upon a paper found in the family safe in the year

1927, which purported to have been executed by Adolph and Josephine Kortum in February, 1891. This paper purported to contain an itemized invoice and appraisement of the separate property of each of the parties thereto, certified to by the signatures of three purported appraisers. Such invoice disclosed the valuation of the property of Adolph at $4,346; and of the property of Josephine, consisting wholly of household furniture, at the sum of $96. To such invoices was added the following written statement:

"Also $700 used in clearing the farm from mortgage, all in Inland Twp. Cedar Co. Iowa. * * * The foregoing shows properties belonging to the undersigned respectively. Each shall have his or hers from now on without interest or expense. The $700 advanced to the husband shall be deducted ultimately out of his property. All earnings and *after acquired property* and increase shall be held proportionately. The above $700 in the name of the wife belongs to her children by her first marriage.

"Dated at Davenport, Iowa, this 25th day of February, 1891.

"Adolph Kortum
"Josephine Kortum."

Such was the beginning of events involved herein. Subsequent to this event, and in the same year, the plaintiff, Albert, was born. In 1894, Josephine received a legacy from her father's estate of $2,500. In the same year, Adolph acquired from a Kortum estate 40 acres of land adjoining his 60-acre farm, for a purported consideration of $1,600. The farm of 100 acres was occupied from such date until March, 1901, when it was sold for a stated consideration of $7,200. At approximately the same time, a farm of 240 acres was bought, for a stated consideration of $20,-000, upon which a purchase-money mortgage for $13,000 was executed. This is known in the record as the Fairfield Township farm. This was occupied by the family until the death of Josephine in February, 1924; and thereafter by Albert, as a tenant, for three years. On March 9, 1927, it was conveyed by Adolph to his son William, defendant herein, subject to a mortgage of $15,-500. Josephine died testate. Her will contained the following Item 5:

"Item Five
"My property now consists largely of indebtedness to me

owing by my husband, Adolph Kortum. A part of this indebtedness is evidenced by a promissory note in the principal sum of three thousand three hundred dollars ($3,300.00) with a large amount of accrued and unpaid interest. In addition to this note, I have loaned to my said husband other sums. I do not make any provision for my husband in this will, and do not bequeath to him any part of my estate, but it is my will that if he shall file in my estate an election to accept this will he shall not be required to pay the indebtedness other than the $3,300.00 note and the interest which shall have accrued thereon. But if he shall elect to demand his statutory interests in my estate, then it is my will that all the indebtedness by him owing shall be collected by my executor. In any event, the $3,300 note spoken of, with all interest accrued thereon shall be fully collected by my executor and the proceeds applied as herein provided.''

Responsive to the foregoing provision of the will of Josephine, Adolph paid the full amount of the note in question, amounting to $4,625, and renounced all claim to distributive share in her estate. Somewhere in the foregoing facts the foundations of plaintiff's case, if any, must be found. The plaintiff has pleaded in separate counts, wherein he has advanced varying theories of right of recovery, which are somewhat inconsistent.

I. First and principally, he contends for a resulting trust to be impressed upon the real property in favor of Josephine, on the theory that she contributed an aliquot part of the purchase money. He contends such aliquot part to be 796/5142 part of the whole. This contention is predicated upon the recitals of the paper of February, 1891. There is no other evidence of the subject-matter contained therein. The statements of that paper may be broadened by inferences fairly deducible therefrom. It will be noted from this paper that Josephine had previously advanced to her husband the sum of $700, and that this had been used by Adolph in paying a mortgage. It will be noted also that the obligation of Adolph for the $700 thus advanced was kept separate and alive as a continuing obligation, to be paid by Adolph out of his own property. It was not to be merged in the joint enterprise, if such. This was emphasized by Josephine's declaration of a trusteeship as to such fund. To quote:

''The $700 advanced to the husband shall be deducted

ultimately out of his property. * * * The above $700 in the name of the wife belongs to her children by her first marriage.''

Whether the trusteeship of Josephine was voluntary and self-imposed, or whether it rested upon legal obligation, is not disclosed. There is no evidence as to the source of the funds, nor any evidence of guardianship or other form of legal obligation. It is enough for our present consideration that she insisted upon segregating the fund from her other property and upon keeping it as the separate and distinct personal obligation of Adolph to her. No claim is advanced in the pleadings that she acted unlawfully or without authority. Nor is there any claim of conversion or dissipation. The beneficiaries of the trust had attained their majority many years before the death of Josephine. No one appears to have challenged in any respect her administration of the purported trust. Nor do the pleadings herein challenge in any manner the rightfulness of Josephine's conduct in making the loan to Adolph. If, therefore, it should be held that this paper operated to join the two estates of husband and wife into one joint estate, it must still be held that the obligation of Adolph for the $700 previously advanced, never became a part of the joint estate. This asset continued as the personal obligation of Adolph to Josephine. This being so, this item must be eliminated from our further consideration of the resulting trust. If the above reservations had been absent from the contract, and if the $700 had been advanced by Josephine as her own money, yet such loan or advancement would not operate as a resulting trust upon a title that had been held by Adolph for 15 years prior thereto.

II. Our foregoing conclusion reduces the contribution of Josephine to the sum of $96, as against the sum of $4,346 for Adolph. The effect of these respective sums is that they fix the proportion of division of future earnings and increase. The paper did not purport to join the two estates into one. On the contrary, it expressly provided: ''The foregoing shows properties belonging to the undersigned respectively. Each shall have his or hers from now on without interest or expense.'' The two several estates were not merged into a joint estate. The proportionate division contemplated by the contract was to operate, not upon the capital investment, but upon earnings and increase: ''All earnings and after-acquired property and increase shall be held proportionately.'' No evidence was offered by either side on the

subject of earnings or of increase. There is no evidence of the value of the combined estates at the time of the death of Josephine. The record, therefore, furnishes no basis for a proportionate division of earnings and increase. But it is contended that the contribution of Josephine in 1891 of $96 necessarily became a part of the purchase price of the Fairfield farm of 240 acres. But the evidence of the appellants themselves is directly to the point that the only moneys that went into the purchase of the Fairfield farm were the proceeds of sale of the 100-acre farm. Appellants concede in their reply argument that no resulting trust had been impressed upon the 100-acre farm sold in 1901. With this concession, it was incumbent upon them to show, for the purpose of resulting trust, that the money of Josephine went into the later purchase. But the direct evidence introduced by the appellants themselves is to the contrary. The invoice of Josephine in 1891 consisted wholly of household furniture. The testimony shows that this form was never changed, and that she owned such property in severalty up to the time of her death. After her death it was claimed and taken by her son Albert, plaintiff herein, as the several property of his mother, and his claim was acquiesced in. If it can be said, therefore, that Josephine contributed any part of the purchase price of the Fairfield farm, such contribution must be found in the undivided earnings. No evidence was directed to such an issue. Moreover, such an issue was one to be settled between the parties themselves, while living, or between their respective estates when they were dead. Neither administrator is a party hereto.

III. Without dwelling upon further details, we proceed to consider a feature of the record which is quite decisive of the case. The contract between husband and wife was purely ex-ecutory. At the time of its execution, nothing passed between them other than their mutual promises. It does not appear from the record that it was ever put into actual effect between them, or that either of them ever purported to perform the same. On the contrary, it appears conclusively from the record that it was never put into effect, and that neither of them ever performed it in whole or in part, and that both of them mutually disregarded it. In view of the mutual non-performance, it became quite nugatory. Neither of them could have en-

forced it in the later years of their lifetime, for want of performance or offer by either. The reasons for such abandonment of the contract are not, perhaps, material, notwithstanding that the record does disclose apparent reasons therefor. In 1894, Josephine received a bequest of $2,500. This circumstance bore heavily upon an interpretation of the contract. Should this acquisition of property by her be deemed earning capital, which would increase her proportionate interest in the earnings and increase? Or, on the other hand, should it be deemed, under the terms of the contract, after-acquired property, to be cast by her into the pool described in the contract as "all earnings *and* after-acquired property *and* increase?" There is no provision in the contract for changing the capital basis for the proportionate division of earnings and increase. Under the literal terms of the contract, the husband could have claimed plausibly that this bequest fell into the pool, as after-acquired property. On its face, this would have been a very inequitable result, and therefore a forbidding interpretation. What the record discloses is that Josephine kept her bequest as her own separate property, and loaned it to her husband as such, and took from him his interest-bearing obligations. The interest earned by her from her husband was not contributed to the pool. The fair inference from the record is that the $3,300 note that she held against her husband at the time of the execution of her will and at the time of her death, comprised the $2,500 debt and the $700 said to be held in trust. The net result of Josephine's management of her own business was that she acquired a separate estate of over $4,600, $1,300 of which was interest collected from her husband. In her will she declared that her husband was owing her other sums of money loaned and interest thereon, and by her will she proposed to her husband to relinquish all claims against him other than that accruing upon the $3,300 note, on condition that he should waive his distributive share in her estate. To this condition the husband later assented. This is a sufficient demonstration of the inconsistency of her attitude with any purported performance of the contract of 1891. The conduct of one party was consistent in that regard with the conduct of the other. It demonstrates clearly a mutual disregard of the contract and negatives the idea that it was ever put into effect; and likewise negatives performance by either party. The

736

contract became, therefore, nugatory. No cause of action ever arose thereon in favor of either party thereto.

The decree of the district court is, accordingly,—*Affirmed.*

All the justices concur.